**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 14-5305**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————

MINGO LOGAN COAL COMPANY,

*Plaintiff-Appellant*,

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Defendant-Appellee*.

—————————————

On Appeal from the United States District Court for the District of Columbia,
No. 1:10-cv-00541

—————————————

**FINAL OPENING BRIEF FOR APPELLANT**

—————————————

ROBERT M. ROLFE
GEORGE P. SIBLEY, III
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200

VIRGINIA S. ALBRECHT
DEIDRE G. DUNCAN
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
(202) 955-1500

PAUL D. CLEMENT
 *Counsel of Record*
JEFFREY M. HARRIS
NATHAN A. SALES
BANCROFT PLLC
500 New Jersey Avenue NW
7th Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Appellant*

December 4, 2015

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellant Mingo Logan Coal Company hereby provides this certificate as to parties, rulings, and related cases, which includes the disclosure required by Circuit Rule 26.1.

### A. Parties and Amici.

Plaintiff-Appellant in this matter is Mingo Logan Coal Company, a subsidiary of Arch Coal, Inc. Defendant-Appellee is the United States Environmental Protection Agency. West Virginia Highlands Conservancy, et al. are *amici curiae* in support of the United States Environmental Protection Agency.

### B. Ruling Under Review.

Plaintiff-Appellant seeks review of an Order and Memorandum Opinion issued by the Honorable Amy Berman Jackson of the U.S. District Court for the District of Columbia on September 30, 2014. *See Mingo Logan Coal Co. v. EPA*, Civil Action No. 10-0541 (ABJ) (D.D.C. Sept. 30, 2014) (Dkt. 107).

### C. Related Cases.

This matter previously was before this Court in *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 1540 (2014). Plaintiff-Appellant Mingo Logan Coal Company is an Intervenor-Defendant in *OVEC v. United States Army Corps of Engineers*, No. 3:05-cv-00784 (S.D. W. Va. filed Sept. 22, 2005), in which several organizations challenged the U.S. Department of the

Army Permit No. 199800436-3, the Clean Water Act section 404 permit that is relevant to this case.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

TABLE OF AUTHORITIES ........................................................................ v

GLOSSARY OF ABBREVIATIONS ........................................................ x

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 4

STATUTES AND REGULATIONS .......................................................... 4

STATEMENT OF THE ISSUE .................................................................. 5

STATEMENT OF THE CASE ................................................................... 5

    A.    The Clean Water Act's Permitting Schemes ....................................... 5

    B.    The Corps Issues, and EPA Revokes, Mingo Logan's Permit ............. 8

    C.    Procedural History .......................................................................... 11

SUMMARY OF ARGUMENT .................................................................. 14

STANDARD OF REVIEW ....................................................................... 17

ARGUMENT ........................................................................................... 18

I.    EPA Arbitrarily And Capriciously Ignored Mingo Logan's Substantial Reliance Interests And History Of Permit Compliance............. 18

    A.    The APA Requires Careful Consideration of Reliance Interests and Compliance History Before a CWA Permit May Be Revoked ...................... 18

    B.    EPA Utterly Ignored Mingo Logan's Substantial Reliance Interests and History of Permit Compliance ..................................... 25

II.    EPA Has Abandoned Without Adequate Explanation Its Prior Conclusion That Mingo Logan's Permit Would Not Have An "Unacceptable Adverse Effect." ................................................................. 31

A. The District Court Erroneously Excused EPA From Its Heightened Obligation Under *Fox* to Justify Its About-Face ............ 32

B. EPA Offers No Adequate Justification for Nullifying Mingo Logan's Permit ..................................................................... 43

III. EPA's Ad Hoc Water Quality Standards Intrude Upon Matters That Congress Reserved To The States................................................... 47

A. Congress Expressly Delegated Responsibility for Considering Water Quality to the States, not EPA ............................ 48

B. EPA Unlawfully Based Its Veto on Water Quality Factors that Congress Intended the States to Consider ......................................... 52

CONCLUSION ............................................................................................. 58

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Addison v. Holly Hill Fruit Prods., Inc.*,
 322 U.S. 607 (1944)................................................................................56

*AEP Tex. N. Co. v. STB*,
 609 F.3d 432 (2010)................................................................ 19, 29, 30

*All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*,
 515 F. Supp. 2d 1 (D.D.C. 2007) ...........................................................41

*Allina Health Servs. v. Sebelius*,
 904 F. Supp. 2d 75 (D.D.C. 2012) ................................................. 36, 37

*Appalachian Power Co. v. EPA*,
 208 F.3d 1015 (D.C. Cir. 2000) .............................................................40

*Arkansas v. Oklahoma*,
 503 U.S. 91 (1992)..................................................................................49

*Ass'n of Private Sector Colls. and Univs. v. Duncan*,
 681 F.3d 427 (D.C. Cir. 2012) ........................................................ 48, 54

*Associated Builders & Contractors, Inc. v. Shiu*,
 773 F.3d 257 (D.C. Cir. 2014) ........................................................ 43, 46

*Bowen v. Georgetown Univ. Hosp.*,
 488 U.S. 204 (1988)......................................................... 21, 26, 27

*Coeur Alaska v. Se. Alaska Conservation Council*,
 557 U.S. 261 (2009)........................................................... 20, 41, 50

*Columbia Broad. Sys. v. FCC*,
 454 F.2d 1018 (D.C. Cir. 1971) .............................................................32

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
 637 F.3d 408 (D.C. Cir. 2011)................................................................40

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

*E.I. du Pont de Nemours & Co. v. Train*,
 430 U.S. 112 (1977)........................................................................20

*Elk Grove Unified School Dist. v. Newdow*,
 542 U.S. 1 (2004)............................................................................56

*\*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)............................................ 3, 13, 16, 18, 19, 32, 33, 43, 46

*Geier v. Am. Honda Motor Co.*,
 529 U.S. 861 (2000).................................................................. 48, 51

*Hillsborough Cty. v. Automated Med. Labs., Inc.*,
 471 U.S. 707 (1985)........................................................................51

*Humane Society v. Locke*,
 626 F.3d 1040 (9th Cir. 2010)...................................................... 35, 36

*Landgraf v. USI Film Prods.*,
 511 U.S. 244 (1994)........................................................................21

*Mingo Logan Coal Co. v. EPA*,
 714 F.3d 608 (D.C. Cir. 2013) ............................................... i, 1, 7, 11

*Mingo Logan Coal Co. v. EPA*,
 850 F. Supp. 2d 133, 137 (D.D.C. 2012) ........................................11, 31

*Mingo Logan Coal Co. v. EPA*,
 Civil Action No. 10-0541 (D.D.C. Sept. 30, 2014) ................................. i

*Mobile Commc'ns Corp. v. FCC*,
 77 F.3d 1399 (D.C. Cir. 1996) ..................................................... 19, 30

*\*Motor Vehicle Mfrs. Ass'n
 v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)............................. 4, 15, 17, 18, 25, 28, 29, 32, 48

*Nat'l Ass'n of Home Builders v. EPA*,
 682 F.3d 1032 (2012)......................................................................42

*NCTA v. Brand X Internet Servs.*,
 545 U.S. 967 (2005)........................................................................32

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir. 2008) ...................................................... 48, 53, 54

*OVEC v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009). ........................................................ 5, 28, 55

*OVEC v. US Army Corps of Eng'rs*,
  No. 3:05-cv-00784 (S.D. W. Va. filed Sept. 22, 2005) ........................... i, 27, 28

*Pac. Nw. Newspaper Guild v. NLRB*,
  877 F.2d 998 (D.C. Cir. 1989) ...........................................................57

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) .....................................................................33

*Ramaprakash v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003)................................................... 32, 47, 57

*Republic Airline, Inc. v. Dep't of Transp.*,
  669 F.3d 296 (D.C. Cir. 2012) .............................................................32

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944).........................................................................41

*Smiley v. Citibank*,
  517 U.S. 735 (1996).........................................................................33

*SWANCC v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001).........................................................................49

*Transcon. Gas Pipeline Corp. v. FERC*,
  485 F.3d 1172 (D.C. Cir. 2007)............................................................56

*White Stallion Energy Ctr., LLC v. EPA*,
  748 F.3d 1222 (D.C. Cir. 2014) ...........................................................19

*Wyeth v. Levine*,
  555 U.S. 555 (2009).........................................................................51

**Statutes**

5 U.S.C. §553 .................................................................................53

5 U.S.C. §706 .................................................................................17

28 U.S.C. §1291 ...................................................................................4

28 U.S.C. §1331 ...................................................................................4

33 U.S.C. §401 ....................................................................................6

33 U.S.C. §403 ....................................................................................6

33 U.S.C. §419 ....................................................................................6

33 U.S.C. §1251 ..................................................................................49

33 U.S.C. §1313 ..................................................................................53

*33 U.S.C. §1342 ...................................................... 4, 5, 22, 49, 57

*33 U.S.C. §1344 ......................................... 1, 4, 6, 7, 22, 27, 39

42 U.S.C. §7609 ..................................................................................39

49 U.S.C. §10707 ................................................................................29

**Rule & Regulations**

33 C.F.R. pt. 325 .................................................................................7

33 C.F.R. §325.7 ............................................... 2, 4, 6, 9, 23, 33

33 C.F.R. §328.3 .................................................................................55

40 C.F.R. §231.2 .................................................................................45

40 C.F.R. §232.2 .................................................................................55

Fed. R. Civ. P. 60(b)(5) ................................................................... 23

44 Fed. Reg. 32,854 (June 7, 1979) ................................................ 24

44 Fed. Reg. 58,076 (Oct. 9, 1979) ........................................... 12, 33

47 Fed. Reg. 22,363 (May 24, 1982) ........................................... 5, 49

49 Fed. Reg. 37,998 (Sept. 26, 1984) ..............................................24

64 Fed. Reg. 43,255 (Aug. 4, 1999) ................................................51

**Other Authorities**

118 Cong. Rec. 33,693 (1972) ........................................................ 22, 29

43 Op. Att'y Gen. 197 (1979) ............................................................23

Exec. Order No. 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999) ................................51

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standards |
| NMFS | National Marine Fisheries Service |
| NPDES | National Pollutant Discharge Elimination System |
| STB | Surface Transportation Board |
| TDS | Total Dissolved Solids |
| WVDEP | West Virginia Department of Environmental Protection |

## INTRODUCTION

Two years ago, this Court held that the Environmental Protection Agency (EPA) has the statutory authority under section 404(c) of the Clean Water Act (CWA)—which authorizes it to "prohibit" the "specification" of disposal sites for discharge permits issued by the Army Corps of Engineers (Corps), 33 U.S.C. §1344(c)—to effectively revoke existing CWA permits previously issued by the Corps. *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013) ("*Mingo Logan II*"), *cert. denied*, 134 S. Ct. 1540 (2014). But the Court did not specifically address *how* EPA may exercise this controversial and expectation-defying power, and it certainly did not suggest that *any* post hoc veto by EPA, even one that ignored reliance interests, would pass muster. To the contrary, the Court suggested that many of the concerns raised by those who doubted that Congress conveyed this extraordinary power to EPA could be ameliorated by the limits imposed by the Administrative Procedure Act (APA). The Court thus remanded for consideration of Mingo Logan's claim that EPA's nullification of its section 404 permit for the Spruce No. 1 coal mine in West Virginia, which the Corps had issued only four years earlier with EPA's explicit consent, was arbitrary and capricious. *Id.* at 616.

Having initially decided that EPA's asserted nullification authority was inconsistent with permit holders' legitimate reliance interests and the Corps' primacy in the statutory scheme, the District Court swung the pendulum too far in the

opposite direction by (mis)reading this Court's remand order as a direction to rubber stamp EPA's revocation decision under the APA. In reality, bedrock APA principles require far more before EPA can simply nullify a validly-issued permit, reverse the prior decisions of both EPA and the Corps which led to the issuance of the permit, and eviscerate the reliance interests engendered by the permit. Measured by familiar APA standards, EPA's revocation of Mingo Logan's permit has all the hallmarks of arbitrary and capricious agency action.

The statutory and regulatory schemes reinforce basic APA principles in rendering EPA's actions arbitrary and capricious. Any agency decision must confront reasonable reliance interests undermined by a regulatory decision that has the effect of revoking a permit. But in recognition of the enormous reliance interests intentionally induced when a section 404 permit is issued, the Corps—the lead player in the permitting process—has promulgated regulations requiring the consideration of a broad spectrum of factors that bear on any decision to modify an existing permit, such as the reliance interests the permit is designed to engender and the permit holder's compliance history. 33 C.F.R. §325.7. Although those regulations do not apply directly to EPA, the APA does. And any regulatory decision that has the same effect as a permit modification or revocation by the Corps should, under the APA, reasonably consider comparable factors. Not so here. EPA gave literally no consideration to the millions of dollars that Mingo Logan has invested in

2

legitimate reliance on its permit—investments that have now been rendered essentially worthless—or to the company's history of faithfully and fully complying with the strict conditions in its permit.

In the same way, EPA was obliged to offer a reasoned explanation for abandoning its decision, just four years earlier, to allow the Corps to issue Mingo Logan's permit—especially since an agency has a heightened duty to justify an about-face when, as here, its prior decision induced detrimental reliance or when, again as here, its new position is based on contradictory factual findings. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Yet EPA made no effort to provide the more detailed justification mandated by *Fox*, nor did the District Court subject the agency's 180-degree pivot to anything but the most cursory judicial scrutiny—and certainly not the nondeferential review that *Fox* entails. The fact that EPA's earlier actions were subsumed within a permit issued by a different agency (*i.e.*, the Corps) makes the statutory scheme unusual, but it cannot possibly free EPA from the obligation to acknowledge and explain deviations in its position.

Finally, the problems here are not limited to what EPA *failed* to consider; they extend to what EPA *did* consider. In deciding to revoke Mingo Logan's permit the agency could not validly rely on factors that Congress never intended it to address— namely, downstream water quality. CWA sections 303, 401, and 402 reflect Congress' judgment that the States, not EPA, are responsible for adopting water

quality standards within their own borders and administering the National Pollutant Discharge Elimination System ("NPDES") permitting program to meet those standards. Not only does EPA's creation of its own ad hoc standards flout Congress' express instructions, it also raises serious federalism concerns by invading West Virginia's prerogatives.

In short, EPA has achieved a rare and impressive trifecta. It has "entirely failed to consider an important aspect of the problem," supplied no "reasoned analysis" for "changing its course," and "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 57 (1983). The decision below should be reversed.

## JURISDICTIONAL STATEMENT

Mingo Logan appeals a final decision of the District Court denying its motion for summary judgment and granting EPA's motion for summary judgment. The District Court had jurisdiction pursuant to 28 U.S.C. §1331. Mingo Logan timely noticed its appeal on November 26, 2014, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291.

## STATUTES AND REGULATIONS

The relevant provisions of the Clean Water Act, 33 U.S.C. §§1342 & 1344, as well as regulations promulgated by the Army Corps of Engineers, 33 C.F.R. §325.7, are reproduced in the Addendum to this brief.

**STATEMENT OF THE ISSUE**

Whether EPA acted arbitrarily, capriciously, or contrary to law when it purported to nullify Appellant's discharge permit under section 404(c) of the Clean Water Act.

**STATEMENT OF THE CASE**

**A.    The Clean Water Act's Permitting Schemes.**

Surface coal mining involves the removal of soil and rock—called "spoil" or "overburden"—to expose the coal deposits beneath. *OVEC v. Aracoma Coal Co.*, 556 F.3d 177, 186, 189-90 (4th Cir. 2009).  When coal extraction ends, some overburden is used to recontour the terrain.  But in most instances excess overburden must be placed in adjacent hollows.  *Id*. at 189-90.  Because these hollows may contain streams that count as "navigable waters" under the Clean Water Act, surface mining often requires a CWA permit.

The CWA generally makes it unlawful to discharge a pollutant into "navigable waters" without a permit.  Most pollutants are governed by the NPDES under section 402 of the Act.  Congress intended that each State administer its own NPDES program, although it authorized EPA to administer the program in the early years immediately following enactment of the CWA until each State could get its program up and running.  33 U.S.C. §1342(b).  West Virginia has been operating its own NPDES program, which EPA concluded met the statutory criteria, for more than three decades.  47 Fed. Reg. 22,363 (May 24, 1982).

The CWA adopts a very different permitting scheme for the discharges of soil and rock that normally result from surface mining. Section 404 authorizes the Army Corps of Engineers, rather than EPA, to "issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. §1344(a). Congress assigned this function to the Corps because that agency had nearly a century of experience regulating dredge and fill activities pursuant to the Rivers and Harbors Acts of 1890, 1899, and 1905. *Id.* §§401, 403, 419.

As the lead federal agency for issuing section 404 permits, the Corps also has a carefully circumscribed authority to modify, suspend, or revoke these permits in narrow and precisely defined circumstances. 33 C.F.R. §325.7. In recognition of the substantial reliance interests purposefully engendered when it issues a permit, the Corps' regulations require careful consideration of a broad range of factors before a permit is revoked or modified, including:

> [1] the extent of the permittee's compliance with the terms and conditions of the permit; [2] whether or not circumstances relating to the authorized activity have changed since the permit was issued or extended, and the continuing adequacy of or need for the permit conditions; [3] any significant objections to the authorized activity which were not earlier considered; [4] revisions to applicable statutory and/or regulatory authorities; and [5] the extent to which modification, suspension, or other action would adversely affect plans, investments and actions the permittee has reasonably made or taken in reliance on the permit.

*Id.* §325.7(a). Those regulatory factors capture a number of considerations that help ensure that any regulatory decision to rescind a prior action, but particularly one

6

engendering reliance interests as substantial as those involved in a section 404

permit, is neither arbitrary nor capricious. Thus, the regulated party's post-permit

conduct, the existence of changed legal or factual circumstances, and reliance

interests are all factors the Corps considers.

In contrast to the Corps' leading part in the permitting process, Congress gave

EPA a subsidiary and carefully confined role. For example, EPA may provide

comments to the Corps during the permitting process. 33 C.F.R. pt. 325. CWA

section 404(c) also allows EPA to "prohibit the specification (including the

withdrawal of specification) of any defined area as a disposal site" if it determines

that "the discharge of such materials into such area will have an unacceptable

adverse effect" on certain enumerated environmental criteria. 33 U.S.C. §1344(c).

Unlike the Corps, which has expressly addressed the regulatory

considerations that inform a revocation or modification decision, EPA has articulated

no guidance about how it would exercise its authority to withdraw the specification

within an existing permit.[1] This Court rejected the argument that the absence of such

explicit guidance demonstrates that such withdrawal authority is lacking, *Mingo

Logan II*, 714 F.3d 608, but it did not address *how* EPA may exercise a power that

---

[1] Similarly, Mingo Logan's permit put the company on notice that the Corps could revisit the permit after issuance in carefully defined circumstances, but it never suggested that EPA might do so. JA296.

has the potential to be every bit as reliance-defying as the Corps' revocation authority.

**B.  The Corps Issues, and EPA Revokes, Mingo Logan's Permit.**

In 1999, Mingo Logan's predecessor applied for a section 404 permit for the Spruce No. 1 coal mine in West Virginia. Over the next several years, the company worked closely with the Corps, EPA, and the State of West Virginia throughout an exhaustive environmental review process. Mingo Logan spent millions of dollars preparing the necessary studies and agreed to a number of mitigation measures, including drastically reducing the proposed scale of the operation, reducing the acreage of affected hollows, and committing to stream creation, restoration, and enhancement efforts. JA19.

In December 2005, the West Virginia Department of Environmental Protection (WVDEP) issued a water quality certification for the Spruce mine pursuant to its authority under CWA section 401(a). JA267-JA272. The State previously had issued permits under the Surface Mining Control and Reclamation Act and CWA section 402. JA209, JA210. Several months later, in March 2006, the Corps released a 1600-page draft Environmental Impact Statement (EIS) concluding that the Spruce mine "would only contribute minimally to cumulative impacts on surface water quality." JA279-JA280. EPA offered a number of comments on the EIS, which the Corps addressed at length. EPA apparently was satisfied with this

resolution:  In November 2006, EPA's Director of the Office of Environmental Programs officially notified a counterpart at the Corps that "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint." JA292.

EPA's withdrawal of its prior concerns cleared the way for the permit's issuance.  In January 2007, after nearly a decade of study, the Corps issued a permit for the discharge of fill material into several streams at the Spruce site.  West Virginia officials would call Spruce "the most heavily studied and scrutinized surface coal mining operation in the history of a state which has a long history with the coal mining industry."  JA327.  Mingo Logan then began ramping up its operations at Spruce in direct reliance on the clear terms of the permit.  The company expended considerable sums of money procuring the necessary equipment, lining up the work force to mine the site, and making arrangements for the transportation, processing, and sale of the extracted coal.  JA23.

Nearly three years (and a presidential election) later, in September 2009 EPA asked the Corps to revoke Mingo Logan's permit in light of purportedly new information.  JA309.  Mingo Logan objected, emphasizing that the company "has invested millions of dollars, commenced operations and operated for over two years in reliance on this permit."  JA314.  Applying its longstanding criteria for permit modification or revocation, 33 C.F.R. §325.7, the Corps refused EPA's request.

9

Instead, it concluded that Mingo Logan had fully complied with its permit and that EPA had provided no new information to justify the extraordinary step of revocation. JA328.

EPA then took matters into its own hands. In March 2010, EPA issued a Proposed Determination announcing its intent to "veto" the permit under section 404(c). JA604. The Corps was opposed, seeing "no basis to take any corrective action regarding the 404 permit we issued." JA1289. West Virginia agreed that revocation was inappropriate, concluding that "[n]one" of EPA's purportedly new information "would cause [the State] to change the water quality certification that it issued for this project" and objecting to EPA's "retroactive, ad hoc departures from existing laws, rules, and guidelines." JA325, JA327. Mingo Logan likewise stressed that the proposed veto came "as Mingo Logan is actively mining the site in an attempt to recoup its decade-long investment." JA708.

Despite these objections, EPA issued a Final Determination in January 2011 withdrawing two of the three disposal sites at Spruce. JA797. Section V.C of the Final Determination claimed the discharges of spoil would have an "unacceptable adverse effect" within the footprint of the fill, and section V.D claimed the discharges would have an "unacceptable adverse effect" on waters downstream from the fill. At no point in the 99-page document did EPA discuss Mingo Logan's significant investments and expenses incurred in reliance on its Corps-issued permit or address

Mingo Logan's track record for compliance. Nor did EPA offer any explanation for abruptly reversing its decision, just four years earlier, to allow the permit to issue. EPA's action was tantamount to a permit revocation, as it would curtail authorized operations at Spruce by 88%. *Mingo Logan Coal Co. v. EPA*, 850 F. Supp. 2d 133, 137 (D.D.C. 2012) (*Mingo Logan I*).

### C.    Procedural History.

On February 28, 2011, Mingo Logan filed a complaint arguing that EPA's actions were both beyond its statutory authority and arbitrary and capricious. The District Court resolved Mingo Logan's *ultra vires* claim on March 23, 2012, concluding that EPA "exceeded its authority under section 404(c) of the [CWA] when it attempted to invalidate an existing permit." *Id.* at 134. According to the court, EPA's claimed post-permit veto power was "contrary to the language, structure, and legislative history of section 404 as a whole," and also "sow[s] a lack of certainty into a system that was expressly intended to provide finality." *Id.* at 139, 152.

This Court reversed, holding as a matter of statutory construction that the CWA grants EPA "a broad veto power extending beyond the permit issuance." *Mingo Logan II*, 714 F.3d at 613. Focusing on the specific language of section 404(c), the Court interpreted Congress' use of the word "whenever" to mean that EPA had "authority to prohibit/deny/restrict/withdraw a specification at *any* time,"

including after a permit has issued. *Id.* The Court also rejected Mingo Logan's arguments based on the CWA's broader statutory structure and legislative history, finding them foreclosed by the text of section 404(c). *Id.* at 614-16. Although the Court recognized that EPA possessed the rather extraordinary power to effectively veto a Corps-issued permit, it remanded for consideration of whether EPA's exercise of that extraordinary authority in this case was arbitrary and capricious. *Id.* at 616.

On remand, the District Court upheld EPA's veto. Although the court professed to be "not unsympathetic" to Mingo Logan's reliance concerns (as evidenced by its earlier decision), it felt constrained by this Court's reversal to reject an APA challenge to an EPA decision that ran roughshod over those reliance interests. JA175n.13. In particular, the District Court held that EPA need not justify its veto with "substantial new information" that was not available when the permit issued, despite an earlier regulatory promise to not revisit a permit absent such information. 44 Fed. Reg. 58,076, 58,077 (Oct. 9, 1979). According to the court, EPA's concerns about the Spruce mine persisted throughout the permitting process, and it was irrelevant that the agency ultimately allowed the Corps to issue the permit. In the alternative, the court held that EPA *did* have substantial new information, concluding that a single new study would suffice to meet this obligation. JA183n.20 ("[E]ven if the only new information ... derives from one study that indicates that

salamanders will not return to fill sites, the Court must defer to EPA's judgment that this information is sufficiently substantial to tip the balance.").

The District Court acknowledged the Supreme Court's *Fox* decision, which held that an agency must provide "a more detailed justification" for a policy shift when its new approach rests on factual findings that contradict its earlier findings, or when its old policy "engendered serious reliance interests." 556 U.S. at 515. But the court excused EPA from this requirement because the agency's decision to veto a permit it had allowed to issue four years earlier was "not so drastic a change." JA179. Instead, the court held that EPA's conclusions were entitled to deference. Thus, applying only the standard level of APA scrutiny, rather than the more-demanding *Fox* standard for changes of position, the court concluded that EPA had "articulated ... a rational connection between the facts found and the choice made." JA186 (quotation marks omitted). The court similarly deferred to EPA's conclusion that the extensive mitigation measures in Mingo Logan's existing permit were insufficient.

Finally, the court upheld EPA's conclusion in section V.D that the permitted fills would harm downstream water quality, notwithstanding Congress' decision to assign States the responsibility for water quality within their borders. Although section 404 does not regulate *outflows from* the Spruce mine's sediment ponds (a matter for West Virginia under section 402), the District Court reasoned that EPA

13

effectively could accomplish the same thing by using section 404(c) to address *inflows to* the sediment ponds. JA198-JA199. Nor was the court persuaded that EPA had improperly adopted water quality standards of its own, as the agency's "measurements or conclusions" about acceptable levels of selenium and Total Dissolved Solids (TDS) at Spruce were not intended to serve as "general standards to be applied in cases involving downstream impacts" in the future. JA203.

## SUMMARY OF ARGUMENT

With great power comes great responsibility. EPA's authority to effectively veto a Corps-issued section 404 permit after it has been issued is an extraordinary power that rivals the Corps' revocation authority. While this Court recognized the existence of that consequential power in its earlier decision, it left for another day any consideration of whether EPA had exercised that extraordinary authority in a manner consistent with the APA. That day has come, and it is clear that EPA's decision to withdraw the specifications in Mingo Logan's duly-issued Corps permit fails the test.

A decision to withdraw the specifications of an existing permit implicates reliance interests, Congress' commitment to finality and stability, and other considerations that are not present when EPA acts to prevent a permit from issuing in the first instance. The Corps' own regulations reflect that reality by directing consideration of reliance interests, post-issuance compliance, and the existence of

substantial legal or factual changes that have occurred since the permit issued.  While the Corps' regulations are not directly binding on EPA, they articulate the kind of considerations any agency would need to weigh before taking an action to upset the reliance interests purposefully engendered by a validly-issued permit.  When judged against those standards, it is clear that EPA has "entirely failed to consider an important aspect of the problem" it is addressing.  *State Farm*, 463 U.S. at 43.  The courts, Congress, and the Corps—and even EPA itself, in a past life—have all recognized that the substantial reliance interests engendered by a permit are a critically relevant consideration that must be taken into account.

Here, the Corps carefully weighed each factor enumerated in its regulation governing permit modifications—including the millions of dollars Mingo Logan has invested in reliance on its permit, as well as its history of full and faithful compliance with that permit—and concluded that no new information justified revocation.  Yet EPA gave no attention to these key criteria, but rather asserted and exercised a sweeping power to veto existing permits for essentially any reason that might have justified a decision to block a permit in the first instance.

Indeed, EPA asserts the authority to withdraw a specification in an issued permit without even explaining the basis for abandoning its earlier decision to allow the permit to issue.  That is contrary to well-established law that demands "a more detailed justification" for such an about-face, especially when the prior position

15

"engendered serious reliance interests." *Fox*, 556 U.S. at 515. In 2007, a senior EPA official announced in no uncertain terms that, in light of modifications and mitigation measures agreed to during the permitting process, "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint." JA292. In 2011, EPA dramatically reversed course and withdrew specifications in the section 404 permit in ways that effectively revoked it for 88% of the Spruce project. Nonetheless, the District Court refused to apply the heightened review mandated by *Fox*, reasoning that EPA's decision to revoke a permit it had approved just four years earlier was "not so drastic a change." JA179.

That conclusion is difficult to fathom. There are few shifts more drastic than initially green-lighting a permit (after carefully considering the environmental consequences) and then red-lighting it (based on a conclusion that the consequences would be "unacceptabl[y] adverse"). Surely, such a volte-face merits (and flunks) the more exacting scrutiny demanded by *Fox*. And the unusual dynamic that EPA's initial decision is subsumed in a Corps permit, but its later withdrawal decision is independent of the Corps, does not excuse an adequate explanation of EPA's change of heart. Congress is free to provide for such an unusual arrangement, and it may impose a heightened requirement on EPA when it acts after the Corps has declined to revoke the permit, but the unusual arrangement does not excuse compliance with the APA or *Fox*.

16

Finally, EPA unlawfully "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Despite the fact that section 402 assigns States the primary responsibility for regulating water quality within their own borders, EPA justified its veto by pointing to alleged impacts on water quality downstream from the Spruce mine and, in so doing, effectively adopted its own ad hoc standards. EPA's consideration of water quality thus is doubly problematic. Not only has the agency ignored Congress's express instructions, it has intruded upon matters that are properly reserved to West Virginia. At a minimum, the agency failed to explain how its actions were consistent with Congress' wishes and the State's interests. It is no defense to say, as the District Court did, that EPA never intended the water quality "measurements or conclusions" it used to evaluate the Spruce mine to serve as "general standards to be applied in cases involving downstream impacts" in the future. JA203. Such "ad hocery" is no defense to an APA claim; it is the very essence of arbitrary and capricious action.

## STANDARD OF REVIEW

EPA's Final Determination must be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). An agency that abandons a prior policy or practice "must" offer "a more detailed justification" when its "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy

17

has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515.

## ARGUMENT

I. **EPA Arbitrarily And Capriciously Ignored Mingo Logan's Substantial Reliance Interests And History Of Permit Compliance.**

This Court has recognized EPA's rather extraordinary authority to effectively veto a Corps-issued permit by withdrawing the specifications from an existing permit. That extraordinary power, however, must be exercised consistent with the APA, which means that it must take due account of the reliance interests purposefully engendered by the permit. In practice, that means that EPA may withdraw a specification when circumstances have changed radically or when the withdrawal has only a minor impact on the operations envisioned (and reliance interests generated) by the permit. But what EPA may not do is what it attempted here—to nullify almost all the reliance interests and practical effect of an existing permit without even attempting to identify substantial changed circumstances or balance competing considerations. This is a textbook example of arbitrary and capricious agency action.

A. **The APA Requires Careful Consideration of Reliance Interests and Compliance History Before a CWA Permit May Be Revoked.**

Blackletter administrative law instructs that an agency may not ignore an important aspect of the problem it is addressing. *State Farm*, 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency has ...

18

entirely failed to consider an important aspect of the problem ....").  The Supreme Court and this Court both have held that the APA's ban on arbitrary and capricious action requires agencies to give due consideration to substantial reliance interests. *See, e.g.*, *Fox*, 556 U.S. at 515 (agency acts arbitrarily and capriciously where it ignores "serious reliance interests"); *AEP Tex. N. Co. v. STB*, 609 F.3d 432, 441 (2010) (holding that STB's abbreviated reliance analysis was arbitrary and capricious); *Mobile Commc'ns Corp. v. FCC*, 77 F.3d 1399, 1407 (D.C. Cir. 1996) (holding unlawful FCC's "fail[ure] to address ... whether its new position was consistent with the [petitioner's] reliance interests"); *see also White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1259 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) ("[I]t is unreasonable for EPA to exclude consideration of costs in determining whether it is 'appropriate' to impose significant new regulations on electric utilities. To be sure, EPA could conclude that the benefits outweigh the costs.  But the problem here is that EPA did not even consider the costs.").  And few regulatory actions engender more substantial reliance than the issuance of a permit.  Indeed, that is the permit's whole point—to give permission to undertake substantial investment in reliance on the permit.

With respect to permits under the CWA in particular, a company's investments made in reliance on its permit and its history of compliance with that permit are matters of surpassing importance, and it is the essence of arbitrary and capricious

action to simply and utterly ignore those aspects of the problem. Indeed, the Supreme Court, Congress, and the Corps—and even EPA itself—have all emphasized that reliance and compliance bear critically on any decision to alter an existing CWA permit. EPA could not lawfully disregard those key factors here.[2]

**1.** The Supreme Court consistently has recognized that the CWA reflects Congress' central goal of promoting stability and finality—basic values that in turn reflect the importance of permit holders' reliance interests. As early as 1977, the Court stressed that the CWA's permitting regime "serves the purpose of giving permits finality," by "insulat[ing] permit holders from changes in various regulations during the period of a permit" and "reliev[ing] them of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977).

The Court voiced similar concerns in *Coeur Alaska v. Southeast Alaska Conservation Council*, 557 U.S. 261 (2009), where it rejected as destabilizing an interpretation of section 404 that would have required discharges of fill material regulated by the Corps under section 404 to meet environmental criteria written by

---

[2] Reliance and compliance are in fact two sides of the same coin. The compliance factor reflects the government's interest in preventing the permittee from undoing the bargain by violating the permit's agreed-upon requirements. The reliance factor reflects the permittee's interest in preventing the government from undoing the bargain by imposing new requirements after substantial investments were made.

EPA to apply to section 402 discharges.  Such a reading, the Court warned, would lead to "confusi[on]" and uncertainty, resulting in "numerous difficulties for the regulated industry."  *Id*. at 276-77.  The concerns underlying the Court's holding that the sections 402 and 404 permitting regimes are mutually exclusive are equally present here.  CWA permits cannot promote "finality" and will only spawn "confusion" if EPA may nullify them without so much as acknowledging reliance interests.

The reason stability and finality matter is because CWA permittees should not have their investment-backed expectations—which were purposefully induced by the Corps' issuance of a permit with EPA's consent—retroactively upended by subsequent government action.  The presumption against retroactivity "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  Government interference with reliance interests is especially problematic in cases, like this one, that involve "contractual or property rights, matters in which predictability and stability are of prime importance."  *Id*. at 271.  For that reason, courts repeatedly have condemned as arbitrary and capricious government actions that "alter[] future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring).

The importance Congress placed on reliance and compliance is also evident in the CWA's safe harbor provisions. Section 404(p) provides that "[c]ompliance with a permit issued pursuant to this section ... shall be deemed compliance" with the CWA itself. 33 U.S.C. §1344(p); *see also id.* §1342(k) (safe harbor for section 402 permits). It thus extends a form of immunity, assuring regulated entities that they will not face liability under the CWA so long as they comply with their Corps-issued permits. The bargain offered by section 404 is both straightforward and beneficial for both sides: It offers permittees the assurance that, if they fulfill the terms of their permits, the government will not arbitrarily render for naught the investments they have made pursuant to those permits.

Section 404's legislative history confirms that Congress regarded reliance and compliance as critical factors bearing on permit revocation. The CWA's primary congressional proponent, Senator Edmund S. Muskie, emphasized that his legislation had "three essential elements": "uniformity, *finality*, and enforceability." 118 Cong. Rec. 33,693 (1972) (emphasis added). Congress' goal of protecting investment-backed expectations thus has complemented its goal of environmental protection from the very beginning, and EPA is no more justified in ignoring the former objective than it would be the latter.[3]

---

[3] Senator Muskie's account of Congress' goals is entitled to special weight, not only because it is consistent with the CWA's text and judicial interpretations, but

**2.** In light of this clear guidance from the courts and Congress, it is not surprising that the Corps attaches great weight to permit holders' reliance interests and compliance history when deciding whether or not to revoke an existing permit. The Corps' regulations require careful consideration of the full range of factors relevant to any decision to alter an existing permit. These include: (1) the permit holder's history of compliance with the permit; (2) any changed circumstances since the permit was issued; (3) objections to the permit that were not considered previously; (4) revisions to the applicable statutes or regulations; and, critically, (5) the extent to which modification would interfere with the permit holder's reliance interests. 33 C.F.R. §325.7(a).

While the Corps' revocation regulation is not directly binding on EPA, it articulates the classic factors that ensure that a government action that revisits a decision that has engendered substantial reliance interests is rational and fair, rather than arbitrary and capricious. *Cf.* Fed. R. Civ. P. 60(b)(5). Only newly-discovered information justifies re-opening past decisions, and even then only in circumstances

---

because of his central role in the law's enactment. Senator Muskie was the chief sponsor of the 1972 CWA amendments, the leader of the Senate delegation to the Conference Committee, and the Chairman of the Senate subcommittee on Air and Water Pollution. Presumably for these reasons, the government has long maintained that Senator Muskie's statement is uniquely helpful in illuminating the aims behind section 404. 43 Op. Att'y Gen. 197, 199-200 (1979) (Congress' intent was "perhaps best summarized by Senator Muskie").

that do not unduly interfere with settled expectations. The degree of reliance interests surely matter (revocation and modification decisions implicate different degrees of reliance) and the equities are informed by the regulated party's history of compliance or non-compliance.

The Corps applied this framework here and concluded that there was no basis for revoking Mingo Logan's permit. JA328. EPA may have been free to reach a different conclusion if it addressed these factors and explained its basis for reaching a different conclusion from the Corps. But in ignoring these factors or any other comparable factors, it ignored important dimensions of the problem of withdrawing a specification long after the permit issued.

Indeed, even EPA itself has previously recognized that reliance interests are a critical consideration under the CWA. In regulations promulgated in 1984, the agency announced that "[i]n general, permits are not modified to incorporate changes made in regulations during the term of the permit. This is to provide some measure of certainty to both the permittees and the [EPA] during the term of the permits." 49 Fed. Reg. 37,998, 38,045 (Sept. 26, 1984). EPA sounded the same theme a few years earlier, when it emphasized that "any attempt to apply limitations or standards which were not in effect at the time of permit issuance constitutes unauthorized overreaching by the permit issuing authority." 44 Fed. Reg. 32,854, 32,869 (June 7, 1979). In both cases, EPA affirmed not merely that finality and

reliance concerns must be addressed when deciding whether to modify permits, but that these considerations could trump later-emerging environmental concerns— indeed, that modifying extant permits to accommodate subsequent environmental standards would be "overreaching." If nothing else, EPA must provide a reasoned explanation for discarding this longstanding prior policy of weighing permit holders' reliance interests. *See infra* Part II.A.

### B. EPA Utterly Ignored Mingo Logan's Substantial Reliance Interests and History of Permit Compliance.

Despite these clear indications about the importance of considering reliance and compliance, EPA paid literally no attention to those key criteria here. The contrast could not be starker: While the Corps carefully weighed the full range of relevant factors in concluding that no new information justified rescinding Mingo Logan's permit, EPA's Final Determination is characterized by its utter disregard for the company's legitimate reliance interests and history of compliance. If that is not an arbitrary and capricious "fail[ure] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, it is difficult to imagine what would be.

Mingo Logan's reliance interests are, to put it mildly, significant. After applying for a permit in 1999, the company spent millions of dollars to prepare the necessary environmental studies and obtain the necessary approvals. JA19. Over the course of the ensuing decade-long administrative review, it agreed to a series of mitigation measures that both dramatically increased its costs of extracting coal from

the Spruce mine and limited it to recovering only 75% of the site's total coal reserves. JA19. Then, after the Corps finally issued the permit, Mingo Logan invested several million dollars more to prepare the site and commence operations. JA23. Unsurprisingly, the Corps cited the "investments and actions the permittee has reasonably taken in reliance on the permit" in concluding that revocation was unwarranted here. JA329.

These reliance interests are especially weighty because EPA's veto has retroactively upended Mingo Logan's investment-backed expectations, which were engendered by the Corps' issuance of the permit with EPA's consent. As in *Bowen*, where hospitals had received more than $2 million in Medicare payments that the Department of Health and Human Services sought to recoup after retroactively changing its reimbursement formula, 488 U.S. at 207, Mingo Logan has invested millions of dollars based on the government's express assurances that it would be allowed to mine the Spruce site, investments that are now rendered essentially "worthless," *id.* at 220 (Scalia, J., concurring).

Indeed, the retroactivity problem here is worse than in *Bowen*. HHS adopted its reimbursement formula retroactively in 1984 only after its previous attempt to adopt the formula prospectively in 1981 was struck down on notice-and-comment grounds. *Id.* at 206-07. As a result, "the countervailing reliance interests are less compelling ... because the original invalidated rule provided at least some notice to

the individuals and entities subject to its provisions." *Id*. at 215. No comparable notice was provided here. To the contrary, EPA allowed the Corps to issue the permit notwithstanding its prior concerns, thereby signaling that it was satisfied with the restrictions and mitigation measures agreed to in the permit. And there was no reason to think that EPA would resurrect its concerns in the future, as this is the agency's first effort to nullify an existing Corps-issued permit. JA15.

Mingo Logan has upheld its end of the bargain by fully and faithfully complying with its permit since the Corps issued it. In refusing EPA's request to rescind Mingo Logan's authorization, the Corps cited the company's "compliance with the terms of its permit." JA329. The Corps would know. Congress has delegated it responsibility for investigating and redressing any violations of section 404 permits, 33 U.S.C. §1344(s), and its judgment on this score therefore is entitled to great weight. In fact, Mingo Logan has even voluntarily curtailed its operations at Spruce beyond the limits spelled out in its permit. Shortly after the permit issued in January 2007, it became embroiled in a pending challenge to other surface mining permits, *OVEC v. U.S. Army Corps of Eng'rs*, No. 3:05-cv-00784 (S.D. W. Va. filed

Sept. 22, 2005), and Mingo Logan agreed to temporarily restrict its activities at Spruce pending resolution of the litigation.[4]

Yet none of this merits a mention from EPA. One searches the 99-page Final Determination in vain for any reference to Mingo Logan's weighty reliance interests or history of complying with its permit, let alone a considered analysis of these critical factors.[5] EPA simply ignored the issues altogether. *State Farm*, 463 U.S. at 46 (rescission of automobile safety standard was arbitrary and capricious because agency "gave no consideration whatever" to adopting an alternative standard). To be sure, not all specification withdrawals will have the same dramatic effect on a permit as EPA's action had here. EPA has curtailed authorized operations at Spruce

---

[4] The Fourth Circuit upheld the other challenged permits, *OVEC*, 556 F.3d at 217, but Mingo Logan's substantively identical permit was not issued in time to be considered in that appeal; the challenge to its permit remains pending.

[5] The closest EPA came was its concession—buried in the hundreds of pages of appendices accompanying the Final Determination—that Mingo Logan has made "significant investments" at Spruce. JA1236. The agency's responses are neither remotely adequate nor even factually accurate. EPA breezily assured Mingo Logan that it could still discharge fill into a single small stream. In fact, EPA's veto of the other two permitted streams curtailed operations at Spruce by 88%, essentially voiding the permit and destroying the value of the company's investments in the mine as a whole. EPA also speculated that the reason Mingo Logan had not attempted to use those other two sites was not EPA's veto but uncertainty about the *OVEC* case—"an ongoing court proceeding without a guaranteed outcome." In fact, the Fourth Circuit had upheld substantively identical permits two years earlier, and the reason the district court deferred consideration of Mingo Logan's motion for summary judgment was the cloud of uncertainty over the permit from EPA's threatened action. *OVEC*, No. 3:05-cv-00784, 2009 WL 3424175 at *3 (S.D. W. Va. Oct. 21, 2009).

by 88%, effectively nullifying the permit altogether.  For the subset of withdrawals that have this effect—*i.e.*, those that amount to outright vetoes of existing permits— EPA's failure to consider the factors weighed by the Corps will yield arbitrary and capricious results.

EPA's failure to give any consideration whatsoever to Mingo Logan's reliance interests compares unfavorably to the abbreviated reliance analysis invalidated by this Court in *AEP*, 609 F.3d 432.  In that case, the Surface Transportation Board (STB) established a maximum rate for railroad transportation services that was based in part on railways' reliance on a prior agency methodology for calculating the cost of equity capital.  *Id.* at 434-37.  The Court found the agency's analysis of reliance inadequate.  Because the Board "rel[ied] only on generalized conclusions about how industry players rely on cost of capital determinations," the Court held that "the Board 'entirely failed to consider an important aspect of the problem.'"  *Id*. at 441 (quoting *State Farm*, 463 U.S. at 43).

Unlike the CWA—an "essential element[]" of which was to protect permit holders' legitimate reliance interests, 118 Cong. Rec. at 33,693—the statute in *AEP* did not require the STB to consider reliance when reviewing rates, 49 U.S.C. §10707.  Yet the STB still gave considerably more attention to the railways' reliance interests than EPA did to Mingo Logan's.  Despite this, the Court found the Board's analysis to be arbitrary and capricious, because it offered no more than

29

"generalized conclusions" about industry-wide practices rather than specific findings about the extent of particular companies' reliance at particular points in time. If the STB's truncated analysis of reliance was arbitrary and capricious, then *a fortiori* EPA's failure to consider Mingo Logan's reliance interests at all violates the APA.

EPA's ignoring of reliance also recalls *Mobile Communications*, 77 F.3d 1399, where the FCC required Mtel to pay for a license after having previously offered assurances that it was eligible for a "pioneer's preference" that exempted it from the payment requirement. *Id.* at 1402-03. The agency "reversed itself at the eleventh hour." *Id.* at 1407. In so doing, the FCC "failed to address such questions as whether its new position was consistent with the reliance interests of Mtel," and the Court therefore concluded that the FCC had not engaged in reasoned decisionmaking. *Id.* Like the FCC, EPA has "reversed itself"—not at the eleventh hour but long after the stroke of midnight—and it has refused to consider Mingo Logan's significant reliance interests.

This omission is not an accident. It is perfectly consistent with EPA's breathtaking view of its veto power under section 404(c). During oral argument before the District Court, EPA took the novel litigating position that it has what amounts to an unlimited authority to alter existing permits, unconstrained by any obligation to weigh criteria that the courts, Congress, and the Corps all see as vital

considerations of actions that have the effect of nullifying or even modifying a duly-issued permit. The District Judge asked EPA's counsel whether the agency's ability to nullify permits is confined to, for instance, situations involving new information. Counsel's response was unambiguous: "the statute and regs do not provide that limitation." *Mingo Logan I*, 850 F. Supp. 2d at 151. It would be passing strange if the Corps—the lead player in the section 404 permitting process—were required to consider the full range of factors that bear on permit revocation while EPA, limited by Congress to a supporting role, could displace the Corps' thorough analysis through a subsequent decision that simply ignores those criteria. But that is not the law. Section 404(c) may authorize EPA to issue post-permit vetoes, and the Corps' regulations may not directly bind the EPA, but EPA's failure to account for the factors that the Corps puts front and center when EPA takes action that substantially vitiates the value of a duly-issued permit is a recipe for arbitrary and capricious decisionmaking.

## II. EPA Has Abandoned Without Adequate Explanation Its Prior Conclusion That Mingo Logan's Permit Would Not Have An "Unacceptable Adverse Effect."

EPA's attempt to nullify Mingo Logan's permit came just four years after the agency gave the Corps the green light to issue that permit. Despite the fact that EPA's veto contradicted the agency's own factual findings from 2007 and disrupted Mingo Logan's significant reliance interests—either of which would trigger an

31

obligation to give "a more detailed justification" for its sudden about-face, *Fox*, 556 U.S. at 515—the District Court declined to apply such heightened scrutiny here. This disregard of *Fox* requires the decision below to be set aside, but EPA's findings and conclusions fail even under the normal APA standards misapplied by the District Court. EPA cannot point to any new information—let alone substantial or more detailed information—that overcomes its prior determination that the Spruce mine will not have an "unacceptable adverse effect."

**A.    The District Court Erroneously Excused EPA From Its Heightened Obligation Under *Fox* to Justify Its About-Face.**

**1.**    The Supreme Court and this Court have long recognized that an agency violates the APA's ban on arbitrary and capricious action when it departs from a prior decision or practice without an adequate explanation. *See, e.g.*, *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (a decision's "unexplained inconsistency" with "past practice" renders that decision arbitrary and capricious); *State Farm*, 463 U.S. at 57 ("an agency changing its course must supply a reasoned analysis"); *Republic Airline, Inc. v. Dep't of Transp.*, 669 F.3d 296, 299-300 (D.C. Cir. 2012). As then-Judge Roberts explained, "failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (quoting *Columbia Broad. Sys. v. FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971).

An agency has a heightened obligation to justify an about-face when, as here, it contradicts its prior findings or has induced detrimental reliance. In *Fox*, the Supreme Court rejected the notion that "*all* agency change [must] be subjected to more searching review" under the APA. 556 U.S. at 514 (emphasis added). But it also identified two circumstances where an agency "must" offer "a more detailed justification than what would suffice for a new policy created on a blank slate": when its "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary or capricious to ignore such matters." *Id*. at 515 (citing *Smiley v. Citibank*, 517 U.S. 735, 742 (1996)). As recently as this March, the Supreme Court "underscore[d] again" that *Fox*'s heightened scrutiny requirement remains good law. *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Yet EPA made no effort to demonstrate that its veto satisfied *Fox*'s stricter standard, nor did the District Court subject the agency to the more rigorous scrutiny mandated by that case.[6]

---

[6] EPA's obligation under *Fox* to provide "a more detailed justification" for its about-face dovetails with the agency's longstanding position—now apparently discarded—that it would be inappropriate to rescind a permit post-issuance absent "*substantial* new information," 44 Fed. Reg. at 58,077 (emphasis added). It also harmonizes with Corps regulations specifying that a permit will not be revoked unless there are "*significant* objections ... which were not earlier considered." 33 C.F.R. §325.7 (emphasis added).

**2.** Both of the circumstances that trigger searching review under *Fox* are present here. As explained above, the issuance of Mingo Logan's section 404 permit engendered significant reliance interests to the tune of millions of dollars in investments. EPA has now rendered these investments essentially worthless. *See supra* Part I.B.

That is cause enough to hold the agency to *Fox*'s higher standard, but there is an additional reason: EPA's nullification of Mingo Logan's permit rests on factual findings that directly contradict those underlying its previous decision to allow the permit to issue. The 2011 revocation is expressly—though unpersuasively, *see infra* Part II.B—premised on a finding that the permit would have an "unacceptable adverse effect" on the environment, whereas in 2007 the Corps was only able to issue the permit because EPA agreed that the permit would *not* have such an effect. Both the ultimate decision to rescind the permit and the underlying adverse-effect finding represent 180-degree reversals of EPA's positions in 2007.

EPA (and the District Court) concede this point, at least implicitly. EPA argued (and the District Court held) that the 2011 veto was justified by "new" information about purported environmental harms that was not available in 2007. JA183n.20. But, putting to one side whether that information was really new or substantial in any way, the "new" information gave rise to "new" findings that contradicted EPA's 2007 decision to green light the permit. In other words, truly

34

"new" information may provide a basis for an agency to satisfy the heightened scrutiny demanded by *Fox* when agency reconsiders the factual predicate for its decision. But reliance on "new" information to reconsider a decision as factually-based as whether there is an adverse environmental effect triggers heightened scrutiny under *Fox*, rather than the ordinary APA standard. EPA therefore had a doubly heightened duty under *Fox* to justify its about-face, and the District Court erred in declining to subject its actions to more searching scrutiny.

EPA's contradictory findings bear a striking resemblance to *Humane Society v. Locke*, 626 F.3d 1040 (9th Cir. 2010). In 2008, the National Marine Fisheries Service (NMFS) authorized several States to kill a number of sea lions because it found that these predators were having a "significant negative impact" on endangered and threatened salmonid in the Columbia River. *Id.* at 1046. In particular, NMFS found that sea lions were killing 3.6% to 12.6% of spring Chinook and 3.6% to 22.1% of steelhead each year. *Id.* at 1045. However, in prior years NMFS had authorized fisheries to kill comparable numbers of listed salmonid— between 5.5% and 17% annually—concluding that these losses would have "minimal adverse effects." *Id.* at 1048. Applying *Fox*, the Court of Appeals stressed that the agency's previous minimal-adverse-effects findings were "in apparent conflict" with its current significant-negative-impact finding, and these "[d]ivergent factual findings ... raise questions as to whether the agency is fulfilling its statutory

mandates impartially and competently." *Id*. at 1049. The court therefore concluded that the sea lion order was arbitrary and capricious. *Id*. at 1053.

The contradiction between EPA's old and new factual findings is even more pronounced than in *Humane Society*. That case involved only a *partial* conflict. It would have been perfectly consistent for NMFS to conclude that the mortality rate at the upper end of the range for sea lions (22.1% of steelhead annually) was a more severe problem than the rate at the upper end of the range for fisheries (17% annually), and therefore justified a more robust regulatory response. Here, by contrast, EPA's new finding of "unacceptable adverse effect" cannot be even partially harmonized with the facts underlying the permit's issuance. They are entirely inconsistent.

*Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75 (D.D.C. 2012), *aff'd in part*, 746 F.3d 1102 (D.C. Cir. 2014), confirms that reliance independently triggers heightened scrutiny. In *Allina*, HHS abandoned its prior practice for calculating Medicaid payments to hospitals that serve a disproportionate share of low-income patients in favor of a new, less favorable, methodology. Under HHS's new formula, payments to the plaintiff hospitals "would decrease by tens of millions of dollars per year." 746 F.3d at 1107. The District Court held that the agency's about-face "falls squarely within the admonition in *Fox*" and it struck down the agency's new

approach as arbitrary and capricious. 904 F. Supp. 2d at 93, 94.[7] Mingo Logan's

reliance interests are every bit as compelling. Indeed, the disruption here is greater:

Whereas HHS was merely reducing the size of its payments to the hospitals, EPA

has destroyed the economic value of Mingo Logan's investments entirely.

    **3.** Despite all of this, the District Court inexplicably excused EPA from its

obligations under *Fox*. After correctly citing the governing precedents, JA178-

JA179 (citing *State Farm* and *Fox*), the court declined to carefully examine EPA's

justification for changing course on the ground that the agency's nullification of a

permit it allowed to issue a few years before is "not so drastic a change as to require

a heightened standard of scrutiny," JA179. That conclusion is mystifying. It is

difficult to imagine a more drastic shift than allowing a permit to issue (based on an

implicit finding that it would have no "unacceptable adverse effect") and attempting

to nullify it (based on a conclusion that the permit *would* have such an effect). By

any reasonable measure, a 180-degree pivot is drastic.

    Nor is there any merit to the District Court's suggestion that EPA consistently

objected to the Spruce mine throughout the permitting process. JA177-JA183. That

suggestion is both factually and legally erroneous. In fact, EPA's 2007 decision to

---

[7] This Court affirmed the substance of the ruling, reversing only as to remedy. 746 F.3d at 1111.

allow the Corps to issue the permit was necessarily premised on a finding that the permit would have no "unacceptable adverse effect."

EPA made this clear in a November 2006 email from William Hoffman, Director of the Office of Environmental Programs, to a counterpart at the Corps. This message officially notified the Corps that "we have no intention of taking our Spruce Mine concerns any further from a Section 404 standpoint." JA292. It also expressly recognized that, as a direct result, the Corps would issue a permit enabling Mingo Logan to mine the Spruce site. JA292 (referring to "post-mining" analysis "of the permitted activities (fills)"). EPA thus withdrew the environmental considerations it had raised in the past, agreeing with the Corps' decision to issue the permit. Whatever concerns EPA once entertained, it no longer regarded them as sufficiently weighty to block the permit.

The circumstances surrounding Director Hoffman's announcement confirm that EPA's approval was not a casual and unconsidered gesture but a deliberate judgment that its environmental considerations had been addressed. EPA's approval came after nearly a decade of give and take in which Mingo Logan proposed to mine the Spruce site, the Corps issued an EIS concluding that the mine would be only minimally harmful, EPA expressed concerns, and Mingo Logan agreed to a number of mitigation measures to alleviate those concerns. This history strongly suggests

that EPA had concluded that the Spruce project, as modified, would no longer produce the "unacceptable adverse effect[s]" it initially feared.

Moreover, if EPA *did* still have any misgivings about Spruce, it had a number of ways to force further environmental review or even kill the project altogether. Most potently, EPA could have exercised its power under CWA section 404(c) to "prohibit the specification ... of any defined area as a disposal site," 33 U.S.C. §1344(c), thereby effectively preventing the Corps from issuing the permit. EPA also could have referred the matter to the White House Council on Environmental Quality for further consideration; indeed, if it had any lingering concerns it was *required* to do so. 42 U.S.C. §7609(b) (if EPA determines that any agency's action is "unsatisfactory from the standpoint of ... environmental quality," it "*shall*" publish its determination "and the matter *shall* be referred to the Council" (emphasis added)). Finally, EPA could have elevated the proposed permit for additional review pursuant to CWA section 404(q). Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army at 6-10 (Aug. 11, 1992), http://perma.cc/932h-7e88. The fact that EPA pursued none of these options is a clear indication it no longer had any concerns sufficient to trigger a section 404(c) action.

Nor does it matter that EPA chose to announce its approval of the permit in an "informal email, as opposed to a formal rulemaking or decision based on formal

process." JA180. EPA announced its approval through a senior agency official—Director of the Office of Environmental Programs—and it represented the agency's considered judgment rendered at the end of a decade-long administrative process. This message "reflect[ed] a settled agency position which ha[d] legal consequences," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000)—*i.e.*, it allowed the permit to issue—and it is irrelevant that EPA chose an electronic "letter to express its definitive position," *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011). Moreover, the District Court itself described EPA's role in the permitting process as relatively informal, JA179 (EPA is not required to "issue a formal declaration"), so it should not come as a surprise if the agency's approval of the permit was in keeping with that character.

But even if (contrary to fact) the District Court's factual premise were correct—*i.e.*, even if EPA had steadfastly opposed the permit, but simply acquiesced in the permit's issuance only to resurrect its objection via a post-issuance specification withdrawal—that would not excuse compliance with *Fox*. EPA would still need to explain why the concerns that were not serious enough for it to block the permit when it could were nonetheless serious enough to take action with much the same effect (and substantial reliance concerns to boot). Congress is free to create an unusual dynamic where one agency is subordinate in the permitting process, but preeminent after the fact and even when withdrawal of the specification will

eviscerate the permit, but creating that dynamic does not repeal either the APA or *Fox.* If anything, the unusual dynamic places even greater importance on explaining why an agency that at least acquiesced in the permit in 2007 nonetheless withdrew the specifications in 2011.

*Coeur Alaska* confirms the significance of EPA allowing the permit to issue. There, the Supreme Court explained that, if EPA "declin[es] to exercise its veto" under section 404(c), the agency "in effect defer[s] to the judgment of the Corps." 557 U.S. at 270. The absence of a veto means that EPA embraced the Corps' findings that Mingo Logan's permit should become operative. The District Court is of course correct that "[o]ne can defer to another, while still not entirely agreeing with their judgment," JA181, but that is beside the point. One only defers to a decision one regards as fundamentally rational. *See, e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (decision must have "power to persuade"). To say that EPA found the Corps' conclusions about the environment "persuasive" is to say that it shared them at some basic level. At a minimum, EPA did not find them to be false—which it did when it nullified the permit four years later.

Equally significant is the fact that EPA's failure to veto a proposed permit amounts to final agency action subject to judicial review under the APA. *See, e.g.*, *All. to Save Mattaponi v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 1, 8-9 (D.D.C. 2007). EPA allowing the Corps to issue the permit was not an instance of simple

inaction, in which the agency remained resolutely neutral on the matter, but a decision on the merits—a decision it later reversed without adequate explanation. And even if EPA's decision were not final agency action, that would only amplify the *State Farm* problem described in Part I. It cannot be that EPA can have a view that is insufficient to dissuade the Corps from issuing a permit but can then assert the same view to vitiate the permit without considering the kind of reliance considerations the Corps weighs when evaluating whether to revoke a permit.

Nothing in *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (2012), on which the District Court relied, JA179, suggests that heightened scrutiny is inapplicable here. In 2008, EPA promulgated a rule requiring home renovators to abate lead paint; the rule included an opt-out provision for owner-occupied housing but EPA rescinded this exemption in 2010. 682 F.3d at 1034-35. This Court acknowledged that an agency must provide a more detailed justification when its new approach rests on factual findings that contradict its prior findings, but it held *Fox* inapplicable because "petitioners cannot point to any new findings, let alone contradictory ones, upon which EPA relied." *Id*. at 1037-38. To the contrary, "EPA did not rely on new facts" when it eliminated the exemption, "but rather on a reevaluation of which policy would be better in light of the facts" it previously had compiled. *Id*. at 1038. Nor was there any claim that petitioners had detrimentally relied on EPA's prior approach. *Home Builders* therefore provides no warrant for

disregarding *Fox* here, where EPA's veto was expressly premised on purportedly "new" and contradictory facts, JA183n.20, and where EPA's prior approval of the permit "engendered serious reliance interests," *Fox*, 556 at 515.

**B.     EPA Offers No Adequate Justification for Nullifying Mingo Logan's Permit.**

Because EPA's about-face triggers *Fox*'s requirement of "a more detailed justification," *id.*, its findings and conclusions are not "entitled to deference," JA186. *Fox* does not just demand more thorough explanations from agencies, it also mandates more robust scrutiny from reviewing courts. *See, e.g.*, *Associated Builders & Contractors, Inc. v. Shiu*, 773 F.3d 257, 263 (D.C. Cir. 2014) (referring to "heightened review" under *Fox*). And while courts have not clarified precisely how much additional scrutiny is called for, *Fox* is plainly incompatible with the extreme deference applied below. But the precise level of scrutiny demanded by *Fox* is largely beside the point, as EPA's findings cannot even survive ordinary APA review. None of the purportedly new information EPA puts forth to justify its veto supports its conclusion that Mingo Logan's permit would have "unacceptable adverse effect[s]."

EPA claims that its veto is justified by scientific studies on water conductivity that were published after the permit issued. But these studies, even if new, cannot support EPA's actions here for a simple reason: Congress has assigned the States the responsibility for regulating water quality within their borders under section 402,

and EPA may not properly take those matters into account under section 404. *See infra* Part III. Stripped of its reliance on impacts that are regulated under the section 402 program, EPA falls well short of demonstrating the unacceptable environmental impacts needed to justify permit revocation. In Section V.C of the Final Determination, EPA cites impacts to four types of wildlife—macroinvertebrates, salamanders, fish, and the Louisiana Waterthrush—within the site of the section 404 discharges. JA837-JA840. But these impacts, to the extent they exist at all, were thoroughly evaluated during the pre-permit period and, in all events, are routine consequences of any section 404 discharge.

The suggestion that EPA learned something "new" about the Spruce mine's impacts on these categories of wildlife between January 2007 and January 2011 strains credulity. EPA, along with the Corps and WVDEP, had studied the mine's impacts on Pigeonroost Branch and Oldhouse Branch since 1998, as a part of no fewer than four comprehensive regulatory actions—the section 402 permitting process, the section 404 permitting process, a Programmatic EIS on Mountaintop Mining, and the EIS devoted specifically to the Spruce mine. Unsurprisingly, in light of these extensive studies, none of the impacts EPA cites in Section V.C differs from the impacts evaluated before the permit was issued. There is no new information on impacts to macroinvertebrates. The supposedly new information on the recolonization behavior of salamanders, JA839, was thoroughly evaluated before

the permit issued, JA1263-JA1282. And there is no new information about impacts to fish or the Louisiana Waterthrush, because there are no fish or Louisiana Waterthrush at the Spruce mine.

Nor are these impacts remotely significant, let alone "unacceptable," in the context of the section 404 program. EPA's own regulations dictate that an environmental impact does not rise to the level of an "unacceptable adverse effect" sufficient to justify permit revocation unless it "is likely to result in ... significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. §231.2(e). None of the impacts EPA cites rises to this level.

EPA never explains why the impacts to macroinvertebrates at the Spruce mine—mayflies, stoneflies, and caddisflies—are significant. These species are neither rare nor endangered, JA1288, and can be found in nearby White Oak Branch and throughout the region, JA825, JA932. And the impacts are no different from the impacts associated with thousands of other permits that authorize fills in streams with macroinvertebrates. JA838. The Final Determination lacks any explanation for why the impacts to these streams constitute a significant loss of macroinvertebrate habitat.

EPA also fails to explain why impacts to salamander habitat would be especially significant. EPA did not quantify the number of salamanders that would

be affected, nor did it explain why the loss of this habitat would be different from impacts associated with any other section 404 discharge in Central Appalachia.

And, unsurprisingly, there is no coherent justification for the finding that impacts to fish or the Louisiana Waterthrush at the site of the fill would be unacceptable.  The fish that EPA claims will be impacted are located downstream of the fill areas—no fish have ever been observed in the portions of Pigeonroost Branch and Oldhouse Branch within the footprint of the section 404 discharges.  JA829-JA830, JA839-JA840.  Nor has the Louisiana Waterthrush, which makes sense, because the Louisiana Waterthrush prefers mature interior forests with perennial streams.  JA291, JA464-JA466.  The relevant portions of Pigeonroost Branch and Oldhouse Branch are intermittent and ephemeral.  The District Court itself recognized that this finding "dances close to the line of what is reasonable," JA188n.23, even under the deferential standard of review it improperly applied.

\* \* \*

In short, EPA was obliged to provide "a more detailed justification" for reversing its decision to approve Mingo Logan's permit, *Fox*, 556 U.S. at 515, and the District Court was obliged to subject EPA's explanation to "heightened review," *Associated Builders*, 773 F.3d at 263.  Yet neither the agency nor the court properly applied *Fox*.  Indeed, EPA's veto fails even under the normal APA standards that the District Court improperly applied.  The purported environmental impacts on which

EPA relies are not "new," as they were thoroughly evaluated before the permit issued, and they cannot rise to the level of "unacceptable adverse effect[s]," as they are routine consequences of any section 404 discharge.

**III. EPA's Ad Hoc Water Quality Standards Intrude Upon Matters That Congress Reserved To The States.**

EPA's refusal to consider Mingo Logan's reliance interests and compliance history, and its inadequate explanation for changing course, render arbitrary and capricious both key sections of the Final Determination—section V.C, concerning the mine footprint, and section V.D, concerning downstream impacts. The latter is arbitrary and capricious for another reason as well: Congress has delegated responsibility for considering water quality to the States, not EPA. Astonishingly, the District Court upheld section V.D partly because EPA used one-time-only "measurements or conclusions" rather than "general standards" that would be applied in future cases, JA203—as though this sort of "ad hocery" were somehow a point in EPA's favor rather than a reason for profound concern, *Ramaprakash*, 346 F.3d at 1130 (Roberts, J.). In reality, EPA could not defy Congress by considering water quality when exercising its section 404 powers. At a minimum, the agency failed to explain how its actions were consistent with Congress' instructions and West Virginia's interests.

47

**A.** **Congress Expressly Delegated Responsibility for Considering Water Quality to the States, not EPA.**

An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; *see also, e.g.*, *Ass'n of Private Sector Colls. and Univs. v. Duncan*, 681 F.3d 427, 448 (D.C. Cir. 2012); *North Carolina v. EPA*, 531 F.3d 896, 917-18 (D.C. Cir. 2008). This problem is especially acute where a federal agency wrongly relies upon factors that Congress intended the States to address. In these situations, there is a confluence of separation-of-powers and federalism concerns: Not only is the agency defying Congress' instructions, it is encroaching upon matters that are the province of State governments. *Cf. Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 908 (2000) (emphasizing the "heightened federalism and nondelegation concerns" that arise when a federal agency preempts State law). If nothing else, an agency that does so must provide a reasoned explanation for disregarding Congress' instructions and the States' interests. None was offered here.

Courts consistently have recognized that, in enacting the CWA, Congress sought to preserve a significant sphere of authority for States to regulate water quality within their own borders. According to the Supreme Court, "Congress chose to 'recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources."

*SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 166-67 (2001) (quoting 33 U.S.C. §1251(b)). The CWA thus strikes a deliberate and careful balance between the powers and responsibilities assumed by the federal government and those remaining with the States. The statute is a prime example of cooperative federalism; it "anticipates a partnership between the States and the Federal Government, animated by a shared objective." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).

Section 402 is one area where this balance tips decidedly in favor of the States. Congress intended the States to administer the NPDES program. It authorized EPA temporarily to administer the program immediately after the CWA was enacted but directed that EPA "shall approve" the transfer of NPDES authority to the individual States once each State had a program that met the statutory criteria for transfer. 33 U.S.C. §1342(a)-(b). EPA may not deny a transfer application if the State meets the criteria, and the transfer of authority under section 402(b) displaces EPA's prior role under section 402(a). *Id.* §1342(c)(1). Once authority is transferred, the agency retains only limited authority to review the State's actions. While EPA may block a State from issuing a given permit, the agency must raise its concerns before issuance and nothing in the statute authorizes it to revoke a State-issued permit. *Id.* §1342(d)(2). West Virginia's NPDES program has been in effect since EPA concluded it met the statutory criteria in 1982. 47 Fed. Reg. 22,363 (May 24, 1982).

49

*Coeur Alaska* confirms that sections 402 and 404 are discrete programs and that EPA may not use section 404(c) to disturb water quality judgments that Congress intended the States to make under section 402. In that case, advocacy groups argued that EPA standards for section 402 discharges of slurry should also apply to slurry discharges that were subject to regulation under section 404. The Supreme Court rejected the claim, affirming EPA and the Corps' judgment that activities regulated under section 404 are not also regulated under section 402 and that standards applicable to 402 discharges do not apply to 404 discharges. Allowing 402 standards to intrude upon the 404 process would "burden industry with [a] confusing division of permit authority." 557 U.S. at 277. Instead, "[t]he regulatory scheme discloses a defined, and workable, line": If the discharged material is subject to section 404 regulation, then section 402 requirements do not apply to it, and vice versa. *Id.*[8]

Just as EPA may not regulate matters that Congress assigned to the Corps, neither may it consider matters that Congress assigned to the States. To be sure, *Coeur Alaska*'s immediate concern was the division of labor between the Corps on the one hand and EPA (not the States) on the other. But its broader concerns about the importance of clearly demarcated lines of authority, and the need to prevent

---

[8] If nothing else, EPA has failed to offer a reasoned explanation for abandoning its position in *Coeur Alaska* that, if the section 404 permitting regime and its standards apply, the section 402 standards do not.

overlap between the distinct permitting regimes of sections 402 and 404, are certainly relevant here. The same "confusi[on]" the Court warned about would result if EPA could arbitrarily displace State water quality standards. States could never be certain that their standards would actually bind the permittees they regulate, and regulated entities could not be confident that their compliance with State standards would suffice. There would always be a lingering possibility that EPA might arbitrarily intervene and displace the State scheme.

That EPA may not consider water quality is also suggested by the limits on federal agencies' ability to preempt State laws. An agency must state its intention to override State law "with some specificity." *Geier*, 529 U.S. at 908; *see also Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718 (1985) (requiring agencies to "make their intentions clear" if they intend to preempt). This clear-statement requirement ensures that agencies give careful consideration to, and adequately explain, actions that affect State interests. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 576-77 (2009) (agencies must make "informed determinations" on preemption, and the legitimacy of an agency's explanation "depends on its thoroughness, consistency, and persuasiveness").[9] The same sort of thorough and

---

[9] The Executive Branch likewise requires agencies to fully consider and explain decisions that interfere with State interests. Exec. Order No. 13,132 §6(c), 64 Fed. Reg. 43,255, 43,258 (Aug. 4, 1999) (requiring agencies to publish a "federalism

detailed explanation was necessary here. If an agency may not preempt State law without giving careful attention to federalism concerns, neither may EPA assume West Virginia's responsibility for water quality without considering and explaining how that would be consistent with Congress' instructions and the State's prerogatives. Yet that is precisely what EPA has done.

## B. EPA Unlawfully Based Its Veto on Water Quality Factors that Congress Intended the States to Consider.

EPA has arbitrarily and capriciously arrogated to itself authority over water quality issues that Congress assigned to the States. Pursuant to its EPA-approved section 402 program, West Virginia first issued an NPDES permit for the Spruce site in 1999. The permit included a number of strict conditions, some of which were suggested by EPA, to ensure that the discharges would comply with federal and State law. JA210-JA230. Since then, the State has reissued the permit several times with various modifications, each time with EPA's express approval. E.g., JA231, JA233. West Virginia's considered and repeated judgment—exercised pursuant to a congressional delegation of power that in turn has been ratified repeatedly by EPA— is that Spruce is entirely consistent with all applicable water quality standards.

The Final Determination impermissibly second-guessed these State determinations and adopted ad hoc water quality standards of EPA's own devising—

---

summary impact statement" before "promulgat[ing] any regulation that has federalism implications and that preempts State law").

and did so, moreover, without following any of the procedures required by law. 5 U.S.C. §553; 33 U.S.C. §1313(c)(3)-(4). EPA now worries, for instance, that the Spruce mine will interfere with "high quality stream and riparian resources," JA797, that the "quality of these streams" will be degraded by mining, JA798, that Spruce will undermine the "integrity of downstream waters," JA799, that "[w]ater quality downstream of [the] valley fills" will be "degraded," JA841, that elevated selenium levels will "lead to degradation of water quality," JA845, that elevated TDS levels "will cause changes to water quality downstream of the mine site," JA851, and so on. These findings all concern a factor that Congress intended the States, not EPA, to weigh, and it was arbitrary and capricious for the agency to consider that factor without at least explaining how doing so was consistent with Congress' express wishes and West Virginia's interests.

EPA's consideration of water quality is arbitrary and capricious for the same reason this Court struck down the agency's Clean Air Interstate Rule in *North Carolina*, 531 F.3d 896. In 2005, EPA established emissions limits for sulfur dioxide as part of a cap-and-trade program under Title I of the Clean Air Act. EPA set the States' sulfur dioxide budgets at levels based on, but substantially lower than, the allowances received by the States' electric generating units under Title IV, a separate program to combat acid rain. *Id.* at 917. According to the Court, acid rain "is not among the objectives" Congress meant to address in Title I, the goal of which instead

is to "prohibit[] emissions within a state from contributing significantly to downwind nonattainment" of National Ambient Air Quality Standards (NAAQS). *Id*. at 918, 922 (quotation marks omitted). Because EPA did not explain how using the acid-rain allowances would prevent nonattainment of NAAQS—nor offer any explanation for setting Title I emissions 50% to 65% below the Title IV baseline— its rule was arbitrary and capricious. *Id*. The same result should obtain here. EPA may not use Title I of the Clean Air Act to consider matters that Congress intended to be addressed in the separate Title IV program, and it may no more use CWA section 404 to consider water quality issues that Congress left to the States in section 402.

*Private Sector Colleges*, 681 F.3d 427, is similarly instructive. In that case, the Department of Education eliminated a regulatory safe harbor that had allowed schools to offer certain raises to employees notwithstanding a general prohibition on incentive payments. *Id*. at 434. The Court concluded that eliminating the safe harbor not only would not promote but actually would frustrate Congress' goal of enabling more students to attend institutions of higher education. The safe harbor was "perfectly in keeping with that goal" and its elimination "could even discourage recruiters from focusing on the most qualified students." *Id*. at 448. The explanation the agency offered for disregarding and indeed thwarting Congress' objectives was inadequate, and the Court therefore held it arbitrary and capricious. *Id*. Just so here.

EPA similarly frustrated Congress' objectives when it assumed responsibility for considering water quality issues that were delegated to the States, and the agency has not offered any explanation for doing so.

There is no merit to the District Court's contention that, although EPA lacks authority to regulate *outflows from* the sediment ponds at the Spruce site (a matter for West Virginia under section 402), it does have authority under section 404 to regulate *inflows to* the sediment ponds from the fill areas. JA198-JA199. The Fourth Circuit—and EPA itself—recently concluded that these inflows are not "waters of the United States" and therefore are not regulated by the CWA at all. In *Aracoma*, the court upheld the Corps' determination that "stream segments that link the fill to a downstream sediment pond," 556 F. 3d at 211, are "waste treatment systems" under Corps regulations and thus are excluded from the definition of "waters of the United States," 33 C.F.R. §328.3(a)(8); 40 C.F.R. §232.2. The Fourth Circuit therefore reversed the lower court's holding that "discharges from the fill into the segment streams were impermissible without a separate CWA §402 NPDES permit." 556 F.3d at 211. Significantly, in a 2006 letter to the Corps, EPA agreed that these inflows are not "waters of the United States" subject to the CWA: "[T]he waste treatment system exclusion *continues* to apply to the creation or use of a waste treatment system in waters below a valley fill permitted by the Corps under CWA §404." *Id*. at 214 (quoting Letter from Benjamin H. Grumbles, Assistant Administrator for the

55

EPA, to the Hon. John Paul Woodley, Assistant Secretary of the Army (Civil Works), Mar. 1, 2006).

The District Court's holding also ignores EPA's own explanation for its actions here. EPA was not concerned about the effect of the permitted discharges on the sediment ponds. It was concerned, as it stated expressly and repeatedly, about the effect on waters that lie "downstream" from Spruce. *E.g.*, JA798, JA799, JA841, JA851. EPA's reason for vetoing Mingo Logan's permit had everything to do with downstream water quality, and the agency may not "achieve by indirection" what Congress has barred it "from doing directly." *Transcon. Gas Pipeline Corp. v. FERC*, 485 F.3d 1172, 1177 (D.C. Cir. 2007) (citation omitted); *see also Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 624 (1944) (Roberts, J., concurring).

Equally unpersuasive—and indeed profoundly troubling—is the District Court's suggestion that EPA did not truly adopt its own water quality standards because it never intended the Final Determination's "measurements or conclusions" for the Spruce mine to serve as "general standards to be applied in cases involving downstream impacts" in the future. JA203. That only makes it worse. EPA's action cannot be rescued by recasting it as "the proverbial excursion ticket—good for this day only." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 25 (2004) (Rehnquist, C.J., concurring in the judgment). Its decree neither offers predictability to regulated entities nor constrains future exercises of agency discretion. And that

sort of "ad hocery" is the very essence of arbitrary and capricious action. *Ramaprakash*, 346 F.3d at 1130 (Roberts, J.); *see also Pac. Nw. Newspaper Guild v. NLRB*, 877 F.2d 998, 1003 (D.C. Cir. 1989) ("core concern" of arbitrary-and-capricious review is to ensure that agencies apply consistent and principled "legal theory" and avoid "ad hocery").

If EPA regarded West Virginia's consideration of water quality inadequate, the agency had a number of straightforward—and publicly visible—remedies under the CWA. For example, EPA could have objected to the original or modified section 402 permits prior to issuance, blocking the State from issuing them at all. 33 U.S.C. §1342(d)(2). More dramatically, if EPA believed that West Virginia was improperly administering its approved NPDES program as a general matter, it could have withdrawn approval of the program altogether. *Id*. §1342(c)(3). That would have required EPA to comply with a host of procedural safeguards, such as holding a "public hearing," designed to provide notice of its intentions and ensure that all interested parties could express their views—including, most importantly, West Virginia itself. As it was, EPA afforded none of these procedural guarantees. Instead, it unlawfully attempted to use its section 404 power as an end run around the elaborate and accountability-promoting mechanisms spelled out in section 402.

## CONCLUSION

For the reasons set forth above, this Court should reverse the decision below.

Respectfully submitted,

<table>
<tr><td></td><td>s/Paul D. Clement</td></tr>
<tr><td>ROBERT M. ROLFE</td><td>PAUL D. CLEMENT</td></tr>
<tr><td>GEORGE P. SIBLEY, III</td><td><i>Counsel of Record</i></td></tr>
<tr><td>HUNTON & WILLIAMS LLP</td><td>JEFFREY M. HARRIS</td></tr>
<tr><td>Riverfront Plaza, East Tower</td><td>NATHAN A. SALES</td></tr>
<tr><td>951 East Byrd Street</td><td>BANCROFT PLLC</td></tr>
<tr><td>Richmond, VA 23219</td><td>500 New Jersey Avenue NW</td></tr>
<tr><td>(804) 788-8200</td><td>7th Floor</td></tr>
<tr><td></td><td>Washington, DC 20001</td></tr>
<tr><td>VIRGINIA S. ALBRECHT</td><td>(202) 234-0090</td></tr>
<tr><td>DEIDRE G. DUNCAN</td><td>pclement@bancroftpllc.com</td></tr>
<tr><td>HUNTON & WILLIAMS LLP</td><td></td></tr>
<tr><td>2200 Pennsylvania Avenue NW</td><td></td></tr>
<tr><td>Washington, DC 20037</td><td></td></tr>
<tr><td>(202) 955-1500</td><td></td></tr>
</table>

<i>Counsel for Appellant</i>

December 4, 2015

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. 1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,742 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

Dated: December 4, 2015

s/Nathan A. Sales
Nathan A. Sales

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that participants in this case not registered for CM/ECF were served via First-Class U.S. Mail.

s/Paul D. Clement  
Paul D. Clement
